Opinion filed July 20, 2006 

















 
 
  
 
 







 
 
  
 
 




Opinion filed July 20, 2006 

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                   __________

 

                                                          No. 11-05-00025-CR 

                                                    __________

 

                                  JOHN
THOMAS BATES, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS,
Appellee

 



 

                                          On
Appeal from the 23rd District Court

 

                                                        Brazoria
 County, Texas

 

                                                    Trial
Court Cause No. 45429

 



 

                                                                   O
P I N I O N

John Thomas Bates entered a plea of guilty to the
stabbing death of his wife.  The jury
convicted appellant of the murder, found that he did not establish by a
preponderance of the evidence that he had acted under the immediate influence
of sudden passion arising from an adequate cause, and assessed his punishment
at confinement for forty-five years.  We
affirm.

                                                               Background
Facts








It was uncontroverted that, at the time of her
death, appellant knew the victim was having an affair with Tom Holcomb, a sex
offender she was counseling.  It was
further uncontroverted that the victim died as a result of the wounds appellant
inflicted with a black-handled serrated kitchen knife from a set the couple
owned and that the blade of the knife was bent. 


Whether or not appellant stabbed the victim under
the immediate influence of sudden passion from an adequate cause was
contested.  Because appellant knew his
wife was having an affair with a sex offender, the State maintained  at trial that appellant had been upset and
angry for days before the stabbing. 
Appellant contended that he had been calm in the days before the
incident and that the words the victim spoke immediately before the incident
gave rise to the sudden passion that influenced his actions.  

                                        Tex. Pen. Code Ann. ' 19.02 (Vernon 2003)

Section 19.02 defines the offense of murder and
declares it to be a first degree felony. 
However, Section 19.02(d) also provides:

At the punishment stage of a trial, the defendant
may raise the issue as to whether he caused the death under the immediate
influence of sudden passion arising from an adequate cause.  If the defendant proves the issue in the
affirmative by a preponderance of the evidence, the offense is a felony of the
second degree.

 

                                                                  Issue
on Appeal

In his sole issue on appeal, appellant contends
that the evidence is factually insufficient to support the jury=s finding.  Appellant argues that the verdict is contrary
to the overwhelming weight of the evidence and that the verdict is clearly
wrong and unjust because the evidence established that he caused the victim=s death under the immediate influence
of adequate cause when the victim told him, AI=ll f--k Tom Holcomb or whoever else I
want in my house.@

                                                              Evidence
Presented

The victim and appellant had been married for
eleven years.  Appellant had two children
from his first marriage who lived with his ex-wife.  The victim had a sixteen-year-old daughter
Samantha Alyse Wolforth who lived with the victim and appellant.  The victim and appellant had a daughter named
Amanda Bates who also lived with them.

Appellant was a shift supervisor at the trustee
camp at the Ramsey II Prison Unit.  At
the time of the murder, he had been employed by the Texas Criminal Justice
System - Institutional Division for almost nineteen years.  As shift supervisor, he was responsible for
300 offenders and three to four officers. 
Appellant also had his own lawn care business.








The victim was a psychologist for the University of Texas Medical Branch and provided
counseling services to inmates.  The
victim also moonlighted as a counselor for sexual offenders at the O=Brien Counseling Services.

Appellant had discovered that the victim was
having an affair with a sex offender she had counseled at the O=Brien Counseling Services.  Appellant testified that, when he confronted
the victim on Tuesday night, she told him that the affair had ended two weeks
earlier and then left the house. 
Appellant made several phone calls during which he told friends and
relatives that the victim was having an affair. 
The victim came home about 3:00 a.m. 
Appellant stated that they slept in the same bed that night.

The next morning at 6:00, appellant awoke Samantha
and told her, AYour
mother told me everything.@  Around 7:00 a.m., appellant loaded his lawn
care equipment on a trailer and disabled both the victim=s
vehicle and Samantha=s
vehicle.  He awoke Amanda  and carried 
her to his truck.  Appellant did
not tell the child where they were going. 
Appellant drove over to a friend=s
house and told his friend about the affair. 
Appellant left his trailer and his lawn care equipment.  Appellant testified that his equipment was
worth about $10,000.  Appellant went to
the bank and withdrew all the money from the couple=s
checking and savings accounts.  Appellant
testified that he withdrew a total of $8,700.

Appellant then drove to the home of his brother
James Dale Bates in Arkansas,
approximately a seven-hour drive from his home in the Angleton area.  During the trip, appellant called a family
law attorney.  When he was unable to
schedule an appointment with that attorney, he called another attorney and made
an appointment for two days later on Friday. 
Appellant called his mother and stopped by to see her at her place of
work.  Appellant also called the victim
three times during the trip.  The victim
told appellant not to come back unless he brought their daughter Amanda with
him.

Appellant and Amanda arrived at James=s house in Arkansas about 10:00 p.m.  Appellant and James stayed up a couple of
hours talking.  The next morning,
appellant told James that he was going back home to talk to the victim.  James offered to drive appellant back to Texas.  Appellant accepted, and they left Amanda at
James=s home in
Arkansas.








The men left at 6:00 a.m. and arrived in Angleton
between 5:00 - 6:00 p.m.  During the
trip, appellant talked about reconciling with the victim and how much he loved
her.  Appellant talked to the victim more
than once and arranged to meet her at their home after she finished working at
the sex offender counseling service.

Appellant and James first went by the home where
appellant gathered some things for both 
Amanda and himself.  They then
went to eat at Sonic.  The men returned
to the home shortly before the victim arrived. 
Appellant went in the sunroom and used the computer to find information
on the  victim=s
lover.  When appellant found information
on Holcomb, he said, AOh,
my God.  He=s
a baby raper.@  Appellant testified that he was Ashocked@
and Astunned@ and that that was the moment he no
longer wanted to Abe with@ with the victim.

The victim arrived home shortly after appellant=s discovery.  She walked into the sunroom.  Appellant said, A[Y]ou=re f-----g that Tom Holcomb, aren=t you, that child molester, Tom
Holcomb, aren=t you?@ 
Appellant testified that the victim answered by asking him who all had
he told Aabout
this.@  Appellant stated that to him that meant the
victim was admitting the affair and that he became worried about his family=s safety.  When the victim told him, AI=ll
f--k Tom Holcomb or whoever else I want in my house,@
appellant testified that he became Aangry,@ Ashocked,@ and Ascared.@ 
He reached for the knife that they kept in the sunroom to open mail and
packages.  He could not move.  The next thing appellant remembered was being
photographed at the sheriff=s
department.

Samantha testified that appellant would eat in the
sunroom and that whatever dishes and utensils he used would stay out in the
sunroom until either she or the victim picked them up.  Samantha stated that the mail was placed on
the wet bar by the side door not in the sunroom and that the family did not
keep a knife in the sunroom to open mail.

Samantha testified that, the day before appellant
took her little sister and left for Arkansas, appellant had called her mother a
Awhore@
and had told her mother that Ahe
was not going to have this shit in his house . . . around his children.@ 
Her mother left the room, and appellant followed.  Samantha wrapped her arms around appellant=s waist in an attempt to slow him
down.  Samantha testified that appellant
seemed Aupset@ and just kept yelling at her
mother.  Her mother left the house.
Later, she heard her mother come home. 
Her mother came into her bedroom and kissed her.  Samantha stated that appellant seemed to be
calm and that she fell asleep.








In the morning, Samantha woke up around 6:30 a.m
to find appellant sitting on the floor opposite her bed.  Samantha testified that appellant Aseemed very subdued@ and Adidn=t have an expression on his face.@ 
Appellant told her that her mother had told him Aeverything@ and 
that he said, AHow
can I ever make love to her again knowing that she did this?@

Samantha fell back asleep.  When she awoke around 10:30 a.m., neither her
car nor her mother=s car
would start, and her little sister was gone. 
Samantha called appellant who told her that he had done Asomething@
to the vehicles.  Appellant also told
her, AI=d really hoped to see you graduate.@ 
Samantha testified that she answered, AYou
still can.  You=re
still my dad.  I don=t know what=s
going on.@  When she asked him about his missing lawn
care equipment, appellant told her, AThey=re safe.@

Dr. Stephen Pustilnik, Chief Medical Examiner for Galveston County and an assistant professor of
pathology at UTMB, performed the autopsy on the victim.  The victim had two types of injuries:  stab wounds (wounds deeper than long) and
incised wounds (wounds longer than deep). 

Appellant stabbed the victim nine times.  Dr. Pustilnik testified that seven of the
wounds were potentially Arapidly@ fatal while the other two were
potentially fatal if infected.  The four
stab wounds above her left breast ranged in depth from a half of an inch to one
inch.  These wounds entered her left
lung, her aorta, her pulmonary artery, and her heart.  There was a stab wound three and a half
inches deep above her right breast and a stab wound five inches deep in her
abdomen just above the belly button.  Dr.
Pustilnik described these two wounds as painful.  The victim also had two stab wounds in her
back and one stab wound in her hip.  One
of the wounds in her back punctured her right lung.

Appellant inflicted multiple incised wounds to
both sides of the victim=s
neck and face, to her left shoulder, to her left hand, to her right arm and
elbow, and to her central chest.  Dr.
Pustilnik described these wounds as superficial.  The wounds to the neck would have been
painful but not fatal by themselves.  The
wounds to the arm and hand were defensive wounds consistent with the victim
guarding herself from appellant=s
attack.

Dr. Pustilnik identified the bent knife recovered
from the sunroom as probably being the murder weapon.  He further stated that the type and pattern
of the victim=s
injuries could have caused the murder weapon to bend.








James stated that, when appellant arrived at his
home, appellant was Ahurt
real bad@ and
that, during their trip to Angleton, appellant was hurt and upset.  James testified that appellant=s mood changed when appellant retrieved
the information on the victim=s
lover.  Appellant stated, AOh, my God.  He=s
a f-----g baby raper@;
and his face became Ablank.@ 
Appellant printed a copy of the information and told James that he was
going to take the information to his attorney the next day.  James testified that the fact that the lover
was a sex offender was Anot
new news.@

James testified that, when the victim came home,
she spoke to him and that he went outside to allow the victim and appellant to
talk in private.  He heard screaming and
looked through a window into the sunroom. 
The victim was on the floor, appellant was kneeling over her, and it
appeared that appellant was hitting the victim. 
James went in and pulled appellant off of the victim.  He saw the knife in appellant=s hand. 
His brother was upset.  James did
not see appellant again until later when appellant was in a police car.

The victim stood up and said, AHelp me.@  James told her to A[g]et
out of here,@ and she
moved toward the door.  The victim Afiddled@
with the lock on the door and then Ajust
kind of went to her knees.@  James called 9-1-1.  James then held a towel to her chest and
began CPR.

Angleton Police Sergeant Ronald Gentry was
dispatched to appellant and the victim=s
home.  Sergeant Gentry stated that appellant
Awaived him down.@  When the officer pulled into the driveway,
appellant walked over to the police car and placed his hands on the trunk and
spread his legs.  Sergeant Gentry testified
that this was unusual behavior.

Sergeant Gentry further testified that, in his
experience with this type of situation, people either were crying and upset or
were hostile and belligerent.  However,
appellant was very calm and Acold.@ 
Appellant was not irrational.  He
was cooperative and knew the Aprocedure.@ 
Sergeant Gentry stated that, while appellant=s
behavior might have been attributed to shock, he had never seen anyone respond
the way appellant did and that he felt appellant knew what he had done.

Testimony was introduced that appellant had broken
the victim=s hand in
a previous argument about a month before the victim=s
death and that he had hit his first wife with a large western belt buckle and
threatened her with a pistol.  








                                                              Standard
of Review

As the trier of fact, the jury was the sole judge
of the weight and credibility of the witnesses=
testimony.  Tex. Code Crim. Proc.
Ann. art. 36.13 (Vernon 1981), art. 38.04 (Vernon 1979). 
Due deference must be given to the fact-finder=s
determination, particularly concerning the weight and credibility of the
evidence.  Zuniga v. State, 144
S.W.3d 477, 481 (Tex. Crim. App. 2004); Johnson
v. State, 23 S.W.3d 1 (Tex.
Crim. App. 2000); Jones v. State, 944 S.W.2d 642 (Tex. Crim. App. 1996).

Section 19.02(d) provides that appellant had the
burden of establishing by a preponderance of the evidence that he acted under
the influence of sudden passion arising from an adequate cause.  For an issue that the defendant has the
burden of affirmatively establishing, the appellate court reviews all of the
evidence to determine if the jury=s
finding is so against the great weight and preponderance of the evidence as to
be manifestly unjust.  Meraz v. State,
785 S.W.2d 146, 154-55 (Tex. Crim. App. 1990). 
While clarifying the standard of review for factual sufficiency
challenges to the evidence to support a conviction, the Zuniga court
reaffirmed the Meraz standard as the proper standard for issues of which
the defendant bears the burden.  Zuniga,
144 S.W.3d at 482.

                                                                      Discussion

Appellant argues that the evidence established
that he had remained calm until the victim=s
statement concerning what sexual activities she could and would conduct in her
own home. He contends that the jury=s
deliberations were clouded by the evidence of a Abrutal
attack@ and Agruesome photographs of a dead woman.@ 
Appellant further argues that the evidence supporting the jury=s finding is so weak that a rational
trier of fact who would not have been swayed by emotion would have found the
issue of sudden passion in his favor.  We
disagree.








The record reflects that appellant knew his wife
was having an affair with a sex offender days before the murder.  The day before the victim=s murder, appellant closed the couple=s bank accounts, disabled the victim=s vehicle, and took their young
daughter out of the state without the victim=s
knowledge or consent.  The next day,
appellant returned to Texas
and arranged to meet the victim at their home where he murdered the victim with
one of their knives.  A rational jury
could have determined that appellant did not establish by a preponderance of
the evidence that his actions were the result of sudden passion arising from an
adequate cause.  The jury=s finding is not so against the great
weight of the evidence as to be manifestly unjust.  The issue is overruled.

                                                                        Holding

The judgment of the trial court is affirmed.

 

TERRY McCALL

JUSTICE

 

July 20, 2006

Do not publish.  See
Tex. R. App. P. 47.2(b).

Panel
consists of:  Wright, C.J., and

McCall,
J., and Strange, J.